

Joseph J. Farnan, Jr., U.S. Atty., Richard G. Andrews (Argued), Asst. U.S. Atty., Wilmington, Del., for appellant.

L. Vincent Ramunno (Argued), Wilmington, Del., for appellees.

Before GARTH, BECKER and ROSENN, Circuit Judges.

**UNITED STATES of America, Appellant,**

v.

**Mario B. and Joseph L. CAPANO, Appellees.**

No. 84–5645.

United States Court of Appeals, Third Circuit.

Argued Feb. 11, 1985.

Decided March 11, 1986.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Equity skimming is the practice of diverting revenues generated by mortgaged property in default to purposes other than property maintenance or mortgage payments. This case presents the question whether a federal criminal statute, 12 U.S.C. § 1715z–4(b) (1982), which proscribes equity skimming from federally-assisted multifamily housing projects, applies although the mortgagor did not receive an extension of time to cure the default or a modification of the mortgage terms. We hold that it does not, and we therefore will affirm the judgment of the district court

which dismissed the indictment on this ground.

## I.

This criminal prosecution arose out of the financial difficulties of Golden Acres Apartments, an 88-unit apartment project built in 1973 and 1974 in Claymont, Delaware. The initial financing for the project included a HUD-insured mortgage of approximately $1.4 million. This mortgage went into default in May 1976, and in September 1976, the mortgage was assigned to HUD and thereafter was held by HUD under the provisions of the National Housing Act, 12 U.S.C. § 1713(g) (1982). The indictment alleges that from on or before February 1977, through December 1981, the appellees, Mario and Joseph Capano, owned all stock in Golden Acres, Inc., the developer and sponsor of the project.

The indictment further states, and it is uncontested by the parties, that from May, 1979, through December, 1981, the Capanos took more than $300,000 of rental income derived from Golden Acres and diverted it to themselves and other businesses they controlled. The indictment thus charges appellees, Mario B. Capano and Joseph L. Capano, with 110 substantive counts of equity skimming in violation of 12 U.S.C. § 1715z–4(b), and with one count of conspiracy, 18 U.S.C. § 371 (1982). The indictment does not allege that the Capanos ever requested or received an extension of time to cure the default on the mortgage or a modification of the terms of the mortgage.

The district court dismissed the indictment for two reasons. First, it held that the criminal penalties of 12 U.S.C. § 1715z–4(b) apply only when a multifamily housing project is insured by HUD and held by a third party mortgagee, not when, as alleged in the indictment, the project is security for a mortgage that has been assigned to and is actually held by the Secretary. In the alternative, the court held that, by the terms of the statute, the criminal penalties apply only where the mortgagors had received an extension of time to cure a default or a modification of the terms of their mortgage. Because the indictment did not allege that the Capanos had ever received such an extension or modification, the district court dismissed the indictment for that additional and independent reason.

The United States brought the instant appeal from the dismissal, arguing that the district court's interpretation of 12 U.S.C. § 1715z–4(b) was incorrect, and that that subsection proscribes equity skimming by any mortgagor whose HUD-held or HUD-insured mortgage on a multifamily housing unit is in default regardless of whether he has received a modification or extension. We have appellate jurisdiction by virtue of 18 U.S.C. § 3731 (1982). Inasmuch as this undertaking involves solely a question of law, our scope of review is plenary. *See Tustin v. Heckler.* 749 F.2d 1055, 1060 (3d Cir.1984).

## II.

Because the district court had two independent reasons for its dismissal of the indictment, we will affirm the district court if we agree with either of its reasons. In the discussion that follows, we assume, without deciding, that the statute applies to mortgages held by HUD and mortgages for which HUD is an insurer.[1] We consid-

---

1. Our assumption is in accord with the only reported case of which we are aware that addresses the question, United States v. Norris, 749 F.2d 1116 (4th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2139, 85 L.Ed.2d 496 (1985), which held that the penalty provision applies to skimming from projects subject to mortgages held by HUD, as well as those insured by HUD. HUD itself, although it supports the instant prosecution, appears previously to have reached the opposite conclusion. A letter dated December 4, 1969, from Acting Associate General Counsel of HUD, John W. Kopecky, to the Department of Justice stated that "there can be no violation of Section 239 after an insured mortgage has been assigned to the secretary." *Reprinted in* Appendix at A53–A54. Additionally, an opinion letter of June 10, 1980, from the HUD General Counsel to the Federal Housing Commissioner is in accord: "[§ 1715z–4 was] intended as a requirement only in cases where the secretary is not the mortgagee." *Reprinted in* Appendix at A25, A47–A48 n. 3. The district court stressed these letters in holding that the

er only whether 12 U.S.C. § 1715z–4(b) applies to even those who have never received an extension or modification of their mortgages. We look to the language of the statute, its legislative history, and well-accepted canons of the interpretation of criminal statutes.

### A. Analysis of the Statute

Because 12 U.S.C. § 1715z–4(b) (hereinafter "subsection (b)") is opaque and convoluted, and because it refers back to 12 U.S.C. § 1715z–4(a) (hereinafter "subsection (a)"), we will set forth both subsections in full.

§ 1715z–4 *Modifications in terms of insured mortgages covering multifamily projects*

*Requests for extensions to cure defaults or for modification of mortgage terms; regulations*

(a) The Secretary shall not consent to any request for an extension of the time for curing a default under any mortgage covering multifamily housing, as defined in the regulations of the Secretary, or for a modification of the terms of such mortgage, except in conformity with regulations prescribed by the Secretary in accordance with the provisions of this section. Such regulations shall require, as a condition to the granting of any such request, that, during the period of such extension or modification, any part of the rents or other funds derived by the mortgagor from the property covered by the mortgage which is not required to meet actual and necessary expenses arising in connection with the operation of such property, including amortization charges under the mortgage, be held in trust by the mortgagor and distributed only with the consent of the Secretary; except that the Secretary may provide for the granting of consent to any request for any extension of the time for curing a default under any mortgage covering multifamily housing, or for a modification of the terms of such mortgage, without regard to the foregoing requirement, in any case or class of cases in which an exemption from such requirement does not (as determined by the Secretary) jeopardize the interests of the United States.

*Violations and penalties*

(b) Whoever, as an owner of a property which is security for a mortgage described in subsection (a) of this section, or as a stockholder of a corporation owning such property, or as a beneficial owner under any business organization or trust owning such property, or as an officer, director, or agent of any such owner, (1) willfully uses or authorizes the use of any part of the rents or other funds derived from property covered by such mortgage in violation of a regulation prescribed by the Secretary under subsection (a) of this section, or (2) if such mortgage is determined, as provided in subsection (a) of this section, to be exempt from the requirement of any such regulation or is not otherwise covered by such regulation, willfully and knowingly uses or authorizes the use, while such mortgage is in default of any part of the rents or other funds derived from the property covered by such mortgage for any purpose other than to meet actual and necessary expenses arising in connection with such property (including amortization charges under the mortgage), shall be fined not more than $5,000 or imprisoned not more than three years, or both.

Subsection (a) states that the Secretary of HUD cannot extend or modify a mortgage on a multifamily housing unit[2] except

---

penalties do not apply to mortgagors under mortgages held by the Secretary.

**2.** Subsection (a) allows the Secretary to promulgate regulations to define "multifamily housing" for purposes of this provision, but HUD has not yet done so. Other HUD regulations define multifamily housing as accommodations designed principally for residential use, conforming to standards satisfactory to the Commissioner of the Federal Housing Administration, and containing at least five rental units. *See* 24 C.F.R. § 207.24. As no one argues that Golden Acres is not multifamily housing, and as nothing in our decision turns on the definition of "multifamily housing," we assume that the gen-

in conformity with regulations that she or he promulgates, and that those regulations shall, among other things, prohibit equity skimming.[3] The regulations can be found at 24 U.S.C. § 207.256b (1985). Not wishing to bind the Secretary unduly, Congress included an "escape clause" in subsection (a): in cases where the regulations would "jeopardize the interests of the United States," the Secretary could extend or modify a mortgage without regard to the regulations.

Subsection (b) provides for criminal sanctions against those who hold "property which is security for a mortgage described in subsection (a)" if the property holder violates "a regulation prescribed by the Secretary under subsection (a);" or, although he is exempt from subsection (a)'s regulations by virtue of the explicit escape clause, or is "not otherwise covered," by the subsection (a) regulations, engages in equity skimming.[4] The result of subsection (b)'s classificatory system is that all those whose property is security for a mortgage described in subsection (a) and who equity skim, are culpable under criminal subsection (b).

It is undenied that the defendants equity skimmed. Therefore, the question in this case is what is meant by "mortgage described in subsection (a)." The question is difficult to answer, for subsection (a) does not describe any mortgages; rather, it places certain limitations on the extension or modification of defaulted mortgages on multi-family dwellings in which HUD has a financial interest.[5] Allowing for this imprecision, the parties put forth two meanings that strike us as most reasonable. The government argues that the phrase "mortgage described in subsection (a)" refers to all mortgages on multifamily housing in which HUD has a financial interest, i.e., ones for which permission of the Secretary would be required before there could be an extension or modification of the mortgage. This reading of the statute would encompass Golden Acres and thus subject the Capanos to criminal liability for their actions. The Capanos argue that "mortgage described in subsection (a)" refers to all mortgages on multifamily in which HUD has a financial interest and which have received an extension or modification. Under this reading, the Capanos would not be culpable.

Given the imprecision just referred to in the language of subsection (b), the "plain meaning" of the words of the statute does not direct a result. Thus, we must consider other aspects of the statute, in particular its structure. In this regard, two points are of special relevance. First, § 1715z–4 does not purport to deal with all aspects of the behavior of defaulted mortgagors but only with the extension or modification of defaulted mortgages. Section 1715z–4's title states explicitly that it concerns "[m]odifications in terms of insured mortgages." This suggests that subsection (b) is similarly limited to instances of mortgage modification or extension, otherwise

---

eral definition of "multifamily housing" may be used here.

**3.** The dissent is therefore incorrect in stating that subsection (a) "unequivocally proscribe[s] the practice of equity skimming from the equity of mortgaged properties." Dissent at 130. Subsection (a) makes restraint from equity skimming a condition of extension or modification of a defaulted mortgage; it says nothing about defaulted mortgages that have not received extensions or modifications.

**4.** Whereas in the first situation equity skimming is defined by the regulations, in the latter two situations the regulations do not apply; the proscription against equity skimming in these situations is thus quite general and it has been left

for the courts to decide in such cases whether a particular use of funds was permissible.

**5.** The dissent ignores this complication, seizing upon the fact that subsection (a) refers to "any mortgage covering multifamily housing," and concluding without discussion that these mortgages must be the ones "described in subsection (a)." Dissent at 131. But, the mere fact that subsection (a) refers to such mortgages does not mean that those are the ones that it describes. Since subsection (a) is concerned with the extension or modification of defaulted mortgages on multifamily dwellings, it is at least equally plausible—and we shall argue below that it is more plausible—that "mortgage described in subsection (a)" means those mortgages that receive extensions or modifications.

the title would be inaccurate. *See Brotherhood of Railway Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 521, 67 S.Ct. 1387, 1388, 91 L.Ed. 1646 (1947) (court may refer to statute's title as an aid in interpretation of ambiguous statutes).

Second, subsection (a) does not come into play unless a mortgage extension or modification is at issue, for subsection (a) is exclusively concerned with these matters. As subsections (a) and (b) were part of the same legislative enactment and were clearly intended to be read together, it follows that subsection (b) should not have a significantly greater scope than subsection (a). This implies that the Capanos' interpretation of subsection (b) is more convincing, for under the government's interpretation, a person could be criminally liable for actions under subsection (b) even though the civil requirements of subsection (a) are inapplicable.[6]

While we could rest on this statutory analysis, confident that the Capanos' reading of the statute, while not the only plausible reading, is nonetheless the better one, we turn now to the legislative history, for it supports that reading.

### B. *Legislative History*

Section 1715z–4 was enacted as § 302 of the Housing and Urban Development Act of 1968, Pub.L. 90–448, 82 Stat. 506. The provision generated no discussion on the floor of either house of Congress. The only evidence of congressional intent is the House Report. Fortunately, the Report is explicit on the point at issue here.

The Report's discussion of § 1715z–4 reads in its entirety as follows:

Section 303 of the Bill would add a new section 239 to the National Housing Act to require that any request for the extension of time for curing a default on an FHA-insured multifamily mortgage, or a modification of the terms of such a mortgage, be approved by the Secretary of Housing and Urban Development in accordance with regulations prescribed by him. During the period of modification or extension any rents or other funds (such as security deposits) derived from the mortgaged property in excess of that needed to meet operating expenses would be required to be held in trust by the mortgagor and distributed only with the consent of the Secretary.

This section is designed to discourage distribution of rental income of multifamily projects to stockholders of a mortgagor corporation or individual owners where such income should be used to meet mortgage payments. Where it is thought that a mortgaged property probably will not generate enough income to meet mortgage payments, there is a temptation for the owners to divert funds received from rentals to their own

---

**6.** On behalf of the government's position, the dissent argues that the Capanos' interpretation of "mortgage described in subsection (a)" would render superfluous the language in subsection (b) referring to "a mortgage not otherwise covered by such regulation." The dissent argues that

> [u]nder the majority's interpretation, only mortgagors who have received an extension or modification of their mortgages would be liable for criminal penalties. Since all such mortgagors are subject to the regulations of subsection (a), it is hard to imagine who might fit into the category of mortgagors liable to criminal penalties but "not otherwise covered" by the subsection (a) regulations.

Dissent at 132.

That this is incorrect is evident from a brief inspection of the regulations HUD has issued pursuant to subsection (a), 24 C.F.R. § 207.-256(b) (1985). The regulations state that a de-

faulted mortgagor cannot receive an extension or modification of his mortgage unless he agrees to hold in trust all monies generated by the mortgaged property that are not needed in the operation of the property. *Id.* The regulations also provide for an exemption decision by the Commissioner of the FHA. *Id.* Two facts about the regulations are particularly important for present purposes: first, that the regulations distinguish between the Commissioner of the FHA and the mortgagee, implying that they are not one in the same; second, that the regulations fall under the subtitle "Rights and Duties of Mortgagee under the Contract of Insurance." It is a fair inference from these facts that the regulations apply only to HUD-*insured* mortgages, not HUD-held ones. Since HUD-held mortgages are not specifically exempted from the regulations, however, it must be that they belong to the class of mortgages "not otherwise covered" by the regulations.

use and to allow the mortgage to go into default in order to recoup their investment in the project and even to show a profit in the investment.

Civil actions have generally proven inadequate as a means of discouraging such actions or of recovering all diverted funds. *Section 239 [§ 1715z–4] would provide criminal penalties for such willful diversion of funds by a mortgagor or a stockholder, director, officer, or agent of the mortgagor during the period in which the time for curing a default has been extended or the terms of the mortgage modified.* The maximum penalty would be a fine of not more than $5,000 or imprisonment of not more than 3 years, or both.

The Secretary in his regulations could provide for granting consent to an extension or modification of a mortgage in any case or class of cases without regard to the requirements of the regulations where he determined such action would not jeopardize the interests of the United States. However, in the case of such exempt mortgages, the knowing and willful use, or authorization of such use, of any part of the rents or other funds derived from the mortgaged property for any purpose other than to meet actual and necessary expenses (including amortization) while the mortgage is in default would carry a similar penalty.

H.R.Rep. No. 1585, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News at 2873, 2906 (emphasis supplied). There is no indication or suggestion that the emphasized portion of the third paragraph was intended to be merely illustrative; to the contrary, its tone is definitive. It is thus a fair implication from that portion that subsection (b) was intended to prohibit equity skimming *only* when a defaulted mortgage had been extended, not when there had been no such extension.

Despite this evidence, the dissent argues that the broader language in the second quoted paragraph—"[the statute is] designed to discourage distribution of rental income of multifamily projects to stockholders of a mortgagor corporation or individual owners where such income should be used to meet mortgage payments"—should take precedence and guide our interpretation. Dissent at 134. We cannot agree. Although the second paragraph is broadly worded, the other three paragraphs are carefully circumscribed; they deal exclusively with mortgage extension or modification. To read the second paragraph literally, as the dissent does, would be contrary to the intention of Congress as expressed in the whole of the quoted section of the Committee Report and especially in the emphasized portion of the third quoted paragraph.

That the Secretary of Housing and Urban Development has read the legislative history as have we strengthens our position. In a letter from John W. Kopecky, Acting Associate General Counsel, to William D. Ruckleshaus, Assistant Attorney General, dated December 4, 1969, the Secretary's counsel stated that "the legislative history indicates the [sic] the criminal penalties under Section 239(b) [subsection (b)] apply only to willful diversions during the period in which the time for curing the default has been extended or the mortgage is under modification." Although the Secretary's interpretation is not binding on this court, it is surely probative. *See, e.g., United States v. Rutherford,* 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979); *Wilshire Oil Co. of Texas v. Board of Governors of the Federal Reserve System,* 668 F.2d 732, 735–36 (3d Cir.1981), *cert. denied,* 457 U.S. 1132, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982).[7,8]

---

**7.** The dissent suggests that inasmuch as HUD supports this prosecution, it has reversed its earlier position which is therefore no longer entitled to deference. In support of this position, the dissent cites *Garcia v. United States,* 469 U.S. 70, 105 S.Ct. 479, 484–85, 83 L.Ed.2d 472 (1985). The reliance is misplaced, however, *Garcia* involved the renunciation by the Solici-

tor General of an interpretation of a criminal statute that he had, in a previous case, stipulated did not reach certain situations. The Supreme Court held that it was not bound by the Solicitor General's previous interpretation, for "'a governmental agency is not disqualified from

### C. *Principles for the Interpretation of Criminal Statutes*

When construing statutes, courts must, of course, give effect to the will of Congress. We would be less than honest, however, if we did not admit that in some cases we cannot determine that will with certainty, and statutes are therefore sometimes left with ambiguity. It is well-settled that where a court's interpretative effort fails to eliminate ambiguity in the meaning of a criminal statute, the residual uncertainty will be resolved in favor of lenity. *See, e.g., Dowling v. United States,* ── U.S. ──, ──, 105 S.Ct. 3127, 3131–32, 87 L.Ed.2d 152 (1985); *Liparota v. United States,* ── U.S. ──, ──, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985). *See also Lewis v. United States,* 445 U.S. 55, 65, 100 S.Ct. 915, 920, 63 L.Ed.2d 198 (1980) (touchstone of lenity principle is statutory ambiguity); *Smith v. Williams,* 698 F.2d 611, 613 (3d Cir.1983); *United States v. Marino,* 682 F.2d 449, 454 & n. 4 (3d Cir.1982). Of course, the federal courts must not use this canon of statutory construction to defeat the congressional purpose in creating a federal crime. *United States v. Turkette,* 452 U.S. 576, 586–87 & n. 10, 101 S.Ct. 2524, 2530–31 & n. 10, 69 L.Ed.2d 246 (1981). The rule " 'comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.' " *Russello v. United States,* 464 U.S. 16, 29, 104 S.Ct. 296, 303, 78 L.Ed.2d 17 (1983) (quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961)).

This rule does not stem from a societal compassion for potential criminals. Rather, the rule expresses the conviction that potential criminal defendants must be accorded fair notice of the proscribed conduct. *See McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931) (Holmes, J.). It is further intended to ensure that Congress, not the courts, defines the scope of prohibited conduct. *Dowling, supra,* 105 S.Ct. at 3132 ("Due respect for the prerogative of Congress in defining federal crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate."). *Cf. Garcia v. United States,* ── U.S. ──, ──, 105 S.Ct. 479, 490, 83 L.Ed.2d 472 (1984) (Stevens, J., dissenting) ("Every increase in the power of the federal prosecutor moves us a step closer to a national police force with its attendant threats to individual liberty. For that reason, I believe we have a special obligation to make

changing its mind' concerning the construction of a statute." *Id.* 105 S.Ct. at 485 (quoting *Barrett v. United States,* 423 U.S. 212, 223, 96 S.Ct. 498, 504, 46 L.Ed.2d 450 (1976)). The Court also relied upon the fact that the Solicitor General's previous interpretation had been in the form of a stipulation: "private agreements between litigants, especially those disowned, cannot relieve this Court of performance of its judicial function.... '[T]he proper administration of the criminal law cannot be left merely to the stipulation of [the] parties.' " *Id.* (quoting *Young v. United States,* 315 U.S. 257, 259, 62 S.Ct. 510, 511, 86 L.Ed. 832 (1942).

We do not deny that HUD can change its mind. Nor do we abdicate to HUD our responsibility to interpret the law and weigh the legislative history. We simply believe that an official, interpretive letter from HUD, contemporaneous with the passage of the legislation in question, that was presumably not motivated by any of the strategic or tactical concerns that might underlie a stipulation between parties during the course of a prosecution, is probative of the meaning of that legislation, and is there-

fore entitled to our most serious consideration. *Garcia* neither holds nor suggests anything to the contrary.

**8.** In the same letter, immediately after the portion quoted in the text, Mr. Kopecky suggested how subsection (b) might be given a broader scope: "However, in [subsection (b)] the clause 'or is not otherwise covered by such regulation' might be construed to cover any diversion under a project mortgage after default." We do not accept this suggestion. Mr. Kopecky's observation has nothing to do with the legislative history of subsection (b) which, as he earlier admitted, and as we have shown, suggests the contrary interpretation of subsection (b). There is thus no reason to read "not otherwise covered" as suggested by Kopecky; indeed, his is a rather tortured reading of the phrase. *Cf. supra* note 6. A second reason to reject this suggestion is that its very difficulty might prevent potential defendants from having fair notice of the meaning of subsection (b). A criminal statute should not be extended through so tortuous a means. *See infra* Part II.C.

sure that Congress intended to authorize a novel assertion of federal criminal jurisdiction")

Both purposes underlying the rule of lenity are served here by our narrow construction of subsection (b). We have argued above that the narrow construction is the more plausible one, supported by the statutory language and context. Even those who disagree must admit that the broader interpretation is not clearly correct, and that subsection (b)'s ambit is ambiguous and open to debate. The Capanos, and any others in their position, were thus without clear guidance on the contours of the criminal law. Moreover, our interpretation leaves it for the Congress, not the courts, to extend the federal criminal sanction. This is as it should be, for Congress is the appropriate forum for the extension of the criminal law. *See Garcia, supra,* (Stevens, J., dissenting). The rule of lenity thus directs us to construe the statute in the Capanos' favor.

### D. *The Logic of the Limitation*

The government's final argument is that limiting subsection (b) to extensions and modifications of defaulted mortgages is simply illogical because equity skimming is as objectionable when there has been no extension or modification as when there have been such alterations. The dissent, too, takes up this line of argument. *See* Dissent at 132. The argument is unpersuasive, however; indeed, it suffers from illogic.

We concede that equity skimming is objectionable regardless of whether an extension or modification has been granted. Thus, the Capanos' conduct is nothing we condone.[9] That does not imply that there is anything illogical about the limited applicability of subsection (b). Congress may have wished to outlaw equity skimming in certain cases because of limited funds for enforcement, or because it felt that an appropriate *quid pro quo* for a mortgagor's benefit from an extension or modification of his mortgage would be that he would run the risk of criminal prosecutions if he skimmed equity. In either case, the limitation is not illogical.

Certainly Congress *could have* proscribed equity skimming on all multifamily mortgages over which federal jurisdiction might be exercised (it could have done so on all such mortgages period, for that matter), but that is of no consequence. We are concerned with what Congress did, not with what it might have done. *Cf. Sitkin Smelting & Refining Co. v. FMC Corp.,* 575 F.2d 440, 447 (3d Cir.1978); *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 368 (3d Cir.1985) ("Although the activity was reprehensible and probably violated state civil and criminal law, we agree that the scheme did not come within the scope of the antitrust laws."). It is not for the courts to create a crime where Congress has not.[10]

---

**9.** We note, however, that the Capanos submit that their conduct was not without some redeeming features. Their brief states, and the government does not deny, that the Capanos initially became involved with Golden Acres in their capacities as principals of J.L. Capano, Inc., the general contractor for the project; that at the time of settlement on the mortgage, J.L. Capano, Inc., was still owed some $234,000 on its building contract with Golden Acres, Inc.; that contemporaneous with the settlement, J.L. Capano, Inc., and Golden Acres, Inc., agreed to refinance the outstanding debt, with full payment to be made on or before December 30, 1974; and that as security, the attorney for J.L. Capano, Inc., held the stock of Golden Acres, Inc., in escrow. The Capanos also contend that on January 7, 1975, with the debt remaining unpaid, J.L. Capano, Inc., took possession of the stock of Golden Acres, Inc., and assumed operation of the project and that, at that time, the half vacant apartment project was floundering. The Capanos assert that they invested more money in the project in an attempt to protect and ultimately to recoup the sum owed to J.L. Capano, Inc., but that their efforts were not enough to avoid default.

The Capanos' rendition of the background to this case is not part of the record at this stage of the litigation, and accordingly we do not rely on it in deciding the case.

**10.** The lack of a criminal proscription did not leave HUD without a remedy against the Capanos. Indeed, the mortgage was held by HUD, and the agency could have foreclosed or sequestered the rents at any time.

## III.

The structure of § 1715z–4 and its legislative history suggest that § 1715z–4(b) was not intended to proscribe equity skimming except in those multifamily mortgages in which HUD had a financial interest and which had received some form of extension or modification. We note that those disagreeing with our assessment of the structure and legislative history of § 1715z–4 would have to admit, at the very least, that whether § 1715z–4(b) does extend to situations where the mortgagor has not received an extension or modification is highly ambiguous. In such cases, the lenity principle dictates that we find in favor of the more restrictive reading of § 1715z–4(b).

The judgment of the district court will be affirmed.

GARTH, Circuit Judge, dissenting:

I dissent because I believe that the unambiguous language of 12 U.S.C. § 1715z–4 criminalizes all equity skimming[1] by mortgagors whose housing is subject to a mortgage which was or is insured by the Secretary of Housing and Urban Development (HUD) and is now in default. This is so regardless of whether or not HUD has granted the mortgagor a modification of mortgage terms or an extension of time to cure a default. The majority ignores this unambiguous congressional direction. Since the indictment recites facts which would establish a criminal violation, I would reverse the district court order dismissing the indictment.

## I.

Subsection (a) of § 1715z–4 provides that the Secretary of HUD may not extend a mortgagee's time for curing a mortgage default, nor may he modify the terms of a mortgage, unless the Secretary's action complies with regulations prescribed by him. The prescribed regulations require that the mortgagor hold in trust all monies generated by the mortgaged property which are not needed in the operation of the property. Thus, subsection 1715z–4(a) and the regulations enacted in accordance therewith unequivocally proscribe the practice of skimming from the equity of mortgaged property.

Subsection (b) of § 1715z–4 establishes criminal penalties for owners of such property who are guilty of equity skimming. Owners who willfully and knowingly use funds derived from the property in violation of subsection (a) and who are convicted of equity skimming may be fined or imprisoned for not more than three years or both. The text of the relevant portions of subsection (a), with its regulations, and the text of subsection (b) are reproduced as an Appendix to this opinion.

The Capanos do not dispute that the indictment sets forth the "willful and knowing" diversion of rents that should have been used to pay mortgage obligations, but that were instead used to pay off construction loans. Section 1715z–4(b)(2)(a) provides that the owner of property whose mortgage is or was insured by HUD, even though he is either exempt from the requirements of the regulations issued under subsection (a) of that section or is "not otherwise covered" by those regulations, is nevertheless subject to criminal penalties if he willingly and knowingly skims equity. (*See* Appendix for text of § 1715z–4(b)(2)(a).)

There is no dispute in this case that the Capano mortgage is "not otherwise covered" by the regulations issued under subsection (a). Those regulations cover only mortgages for which an extension of time or a modification has been granted. The Capano mortgage is not such a mortgage, but rather is a mortgage in default for which no extension or modification was ever requested. By the clear language of the statute, any mortgage under subsection (a), whether such mortgage is exempted by a determination of the Secretary or whether it is "not otherwise covered" because no

---

1. Equity skimming is the practice of diverting revenues generated by mortgaged property in default to purposes other than maintenance or mortgage payments.

modification or extension was ever granted, comes within the purview of the equity skimming prohibition and therefore subjects the mortgagor to criminal penalties for skimming.[2]

Thus, having demonstrated that the statute covers all mortgages described in subsection (a), be they exempt or not, be they covered or not covered by regulation, be they in default or be they extended or modified, we need only determine whether the Capano mortgage is "a mortgage described in subsection (a)" as that phrase is used in subsection (b), § 1715z–4(b)(2).

Under the majority's present analysis, it is clear that the criminal penalties of subsection (b) are triggered only when the mortgagor receives an extension of time to cure his default or a modification of the terms of his mortgage. *See* maj. op. at 125. Thus, the majority implicitly holds that subsection (a) does not come into play, when the mortgagor defaults without requesting a modification or an extension of the mortgage. Nor does it come into play in the majority's view, when the mortgagor has requested a modification or an extension and has been denied.

According to the majority, only a mortgage that has been extended or modified falls within the terms of subsection (b). Yet the plain language of subsection (a) in no way limits the description of a mortgage to those which have been extended or modified. In relevant part, as we have noted, subsection (a) reads: "The Secretary shall not consent to any request for an extension of the time for curing a default under *any mortgage covering multifamily housing,* as defined in the regulations of the Secretary." 12 U.S.C. § 1715z–4(a) (emphasis added).[3]

As I have pointed out, it is clear that this statute includes within its definition of "mortgages" all HUD mortgages that are in default, whether or not a request for an extension of time or a modification of terms has ever been granted. In contrast, the majority opinion, which regards the granting of an extension or modification as the trigger for criminal liability, would subject the equity skimmer to criminal liability for skimming only when he has received an extension or modification, while it would allow the equity skimmer who never sought an extension or modification, or whose request for extension or modification was denied, to get off scot-free. There can be no logical reason for Congress to have preferred the equity skimmer who never applied for an extension or modification, or whose request for an extension or modification was denied, over the equity skimmer whose request is granted. Yet the majority opinion, without giving a reason therefor, and without explaining this

---

**2.** The Capanos do not claim that they have been exempted from the requirements of the regulations. However, if, following a hypothetical extension or modification of their HUD mortgage, the Capanos had been exempted from the requirement that they place all revenues from the property in a trust, they would still be liable to prosecution for equity skimming. The statute and its regulations clearly proscribe all equity skimming and provide that equity skimmers may be criminally indicted, even if the equity skimmer has been exempted from compliance with the deposit in trust provisions of the statute, and even if the equity skimmer is not otherwise covered by the regulations. This legislative intent was explicitly stated by the House Committee in its Report as follows:

The Secretary in his regulations could provide for granting consent to an extension or modification of a mortgage in any case or class of cases without regard to the requirements of the regulations where he determined such action would not jeopardize the interests of the United States. However, in the case of such exempt mortgages, the knowing and willful use, or authorization of such use, of any part of the rents or other funds derived from the mortgaged property for any purpose other than to meet actual and necessary expenses (including amortization) while the mortgage is in default would carry a similar penalty.

H.R.Rep. No. 1585, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News at 2906.

**3.** Although HUD has not promulgated any regulations defining "multifamily housing" for the purposes of this provision, other regulations define multifamily housing as accommodations designed principally for residential use, conforming to standards satisfactory to the Commissioner of the Federal Housing Administration, and containing at least five rental units. *See* 24 C.F.R. sec. 207.24.

anomaly, would absolve from criminal liability the skimmer who made no request or whose request was denied, while punishing the skimmer whose request was granted.

This interpretation of the statute would render superfluous, as best I can discern, the language of section 1715z–4(b)(2)(a) referring to "a mortgage not otherwise covered by such regulation." Under the majority's interpretation, only mortgagors who have received an extension or modification of their mortgages would be liable to criminal penalties. Since all such mortgagors are subject to the regulations of subsection (a), it is hard to imagine who might fit into the category of mortgagors liable to criminal penalties but "not otherwise covered" by the subsection (a) regulations.

The majority seeks to find meaning for the category of mortgages "not otherwise covered" by the regulations in the fact that, in its view, those regulations apply only to *HUD-insured* mortgages, not to *HUD-held* mortgages,[4] whereas the criminal penalties of § 1715z–4(b) apply to both HUD-held and HUD-insured mortgages. The "not otherwise covered" category, the majority speculates, would thus comprise those HUD-held mortgages that had once been extended to modified. Maj. op. at 126 n. 6

But the regulations nowhere state that they apply only to HUD-insured mortgages and not to HUD-held mortgages. Furthermore, under this interpretation, the criminal penalties of 1715z–4(b) would apply to those mortgagors whose mortgages were taken over by HUD after they had reached

an agreement as to extension or modification, but not to similarly situated mortgagors who defaulted without seeking such an agreement. This distinction is arbitrary and illogical when viewed in terms of the purpose of the statute. Under this interpretation, Congress would have given equity skimmers the perverse incentive of avoiding all communication with HUD so that they could then escape criminal liability. Again, it is unclear to me why Congress should have wished to subject the equity skimmer to criminal penalties when he receives an extension or modification of the terms of his mortgage, while exculpating the equity skimmer who neither requests nor is granted an extension or modification. Again, the majority has failed to explain what could possibly have motivated Congress to make such an illogical distinction.

The majority can make sense of the language of section 1715z–4(b)(2) only by creating artificial distinctions which Congress did not see fit to make and which bear no relation to Congress's purpose in enacting this provision, namely the prevention of equity skimming from property in which HUD has a financial interest as mortgage insurer or as mortgagee. Only if it is recognized that criminal penalties apply to equity skimming from all HUD mortgages, whether or not there has been a request for extension or modification, whether or not such request has been granted, and whether they are HUD-held or HUD-insured,[5] can the language of section 1715z–

4. A HUD-held mortgage is a mortgage once insured by HUD, that has been defaulted on by the mortgagor and subsequently taken over and held by HUD.

5. In its affirmance of the district court, the majority tentatively disclaims reliance on the argument of the Capanos, accepted by the district court, that criminal penalties apply only to skimming involving HUD-*insured* mortgages, not HUD-*held* mortgages. *See* maj. op. at 123 n. 1. The Capanos' argument should be rejected unequivocally.

The short answer to any such argument is first to be found in the plain language of subsection (a). The statute in no way limits the description of a subsection (a) mortgage to those

merely insured by HUD. The temptation to skim equity from a HUD-held mortgage is as great as the temptation to skim equity from a HUD-insured mortgage. The concern of Congress was focused upon deterring equity skimming through criminal penalties, not merely upon providing HUD as an insurer with an alternative to civil remedies in case of default, as the majority theorizes (see maj. op. at 18 n. 10). Second, *United States v. Norris,* 749 F.2d 1116 (4th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2130, 85 L.Ed.2d 496 (1985) holds that 12 U.S.C. § 1715z–4(b)(2) unambiguously embraces within its provisions *HUD-held* mortgages such as the Capano's defaulted mortgage here. Finally, if this argument were accepted,

4(b)(2) be given content in accordance with the plain and ordinary meaning of that language.

Because it is obvious that the focus of the statutory provision is on equity skimming and its prevention rather than on requests for modification of HUD mortgages, I believe that section 1715z–4 makes criminal the diversion of rental income prior to payment of the obligations of a defaulted mortgage insured or held by HUD, and that the indictment therefore adequately states a charge against the Capanos whether or not they requested an extension or modification.

## II.

According to the Supreme Court,

[T]he starting point for interpreting a statute is the language itself. Absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.

*Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

The majority points to no expression of a legislative intent which would even intimate that section 1715z–4 penalties could not be assessed against mortgagors of any defaulted HUD-insured mortgage. Rather the majority opinion relies on the lack of an affirmative statement of legislative intent, on an equivocal and outdated letter from HUD's general counsel that is not entitled to our deference, and on an interpretation, which I believe to be unsupportable, of the scope of the literal language of the statute in order to support its refusal to apply the statute by its terms.

I have discussed earlier in this opinion the plain meaning of the statute, pointing out that it obviously applies to all HUD mortgages, and that it proscribes skimming equity from *any* property that is security for a defaulted mortgage that is or has been insured by HUD.

The only other court of appeals decision interpreting this statute does not even deign to discuss the identifying characteristics of extension or modification that the majority claims define a subsection (a) mortgage. The Fourth Circuit, in *United States v. Norris,* 749 F.2d 1116 (4th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2139, 85 L.Ed.2d 496 (1985), construed the very section under consideration here. That court held that a mortgagor whose mortgage was assigned to HUD, and who continued in default, was properly indicted and convicted for a violation of section 1715z–4(b). The Fourth Circuit stated:

The language and intent of the statute are clear and need no interpretation from HUD. The congressional intent is to prevent money of federally insured housing projects from being diverted to purposes other than actual and necessary expenses when the mortgage is in default. Congress enacted 12 U.S.C. § 1715z–4 in an effort to stop the diversion of funds from other than "actual and necessary expenses arising in connection with such property." Section 1715z–4(a) addresses insured mortgages and § 1715z–4(b) covers conversion of rents during default in cases "exempt from the requirement of any such regulation or is [sic] not otherwise covered by such regulation." The proscribed activity is clear because it applies to owners of property under mortgage who willfully and knowingly use any part of the rents or funds derived from the property for any purpose other than to meet the actual and necessary expenses, while the mortgage is in default. There is no need for HUD regulations to describe what is unlawful. The statute clearly states that if the loan is in default one may not use rent for any purpose other than meeting the actual and necessary expenses. This is the activity charged against the two defendants in fifteen of the counts in the indictment. The language is not ambiguous, and the intent is obvious to persons such

the majority's already implausible attempt to give content to the "not otherwise covered" lan-

guage of subsection (b) would collapse entirely.

as defendants who were involved with many federally insured projects.

Criminal statutes should be given their fair meaning in accord with the evident intent of Congress. *United States v. Rothberg*, 480 F.2d 534 (2d Cir.1973), *cert. denied*, 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973). Congressional intent is quite obvious under any reading of 12 U.S.C. § 1715z–4(b)(2). The statute is intended to prevent the skimming of funds while the mortgage is in default.

\*       \*       \*       \*       \*       \*

The requirements of the statute are clear and unambiguous. The proscribed acts are obvious to anyone of normal intelligence. The appellants were experienced in dealing with federally insured housing projects and the meaning and intent of the statute would be immediately apparent to them.

*United States v. Norris*, 749 F.2d at 1120–21.

Thus, *Norris* sustained the conviction of a defendant charged under section 1715z–4(b) where no extension or modification of the HUD mortgage was ever sought or obtained. *Norris* reached its conclusion as I do: the statute under which the *Norris* defendants were charged and under which Capano was charged is unambiguous and clear. In my opinion, there is no need to resort to strained interpretations in order to avoid the explicit command of Congress. The statute provides penalties for skimming involving mortgages covering multifamily housing. 12 U.S.C. § 1715z–4. No further inquiry is necessary as to whether a request for extension or modification was or was not made. If skimming is charged under the statute, the indictment is sufficient and cannot be dismissed, regardless of whether a request for extension has been made, denied or granted.

As I have earlier observed, the majority concludes that Congress intended to subject the mortgagor to criminal penalties only if that mortgagor is granted an extension or modification. The legislative history which is reproduced in the majority opinion concededly deals with such a situation, but the congressional intent revealed by that history is by no means so strictly limited. The crux of that history, I believe, is to be found in the *purpose* portion of the House Report. There, it is stated:

This section is designed to discourage distribution of rental income of multifamily projects to stockholders of a mortgage corporation or individual owners where such income should be used to meet mortgage payments. Where it is thought that a mortgaged property probably will not generate enough income to meet mortgage payments, there is a temptation for the owners to divert funds received from rentals to their own use and to allow the mortgage to go into default in order to recoup their investment in the project and even to show a profit in the investment.

H.R.Rep. No. 1585, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News at 2906. The other sections of the Report and the portions on which the majority rely are no more than explanations of how the *purpose* of the new provisions may be implemented. Under *GTE Sylvania*, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766, only an expression of *contrary* legislative intent avoids the unambiguous terms of a statute. Here, the terms of the statute speak loud and clear, and the legislative history, far from contradicting these terms, support them.

This court should not embrace an interpretation of legislative intent that leads to an absurd or inconsistent result when a consistent interpretation is readily apparent. The legislative intent, as described in the House Report, was to provide HUD with a more effective means of protecting its financial stake in all cases where there is a temptation for the mortgagor to divert rental income to private uses. This express intent accords precisely with the literal terms of section 1715z–4. Under these circumstances, I do not believe it is appropriate for us to displace the Congress's policies with our own.

The majority also supports its refusal to apply section 1715z–4 in accordance with

its terms by reasoning that, as a policy matter, "the lack of a criminal proscription did not leave HUD without a remedy against the Capanos, for the mortgage was held by HUD, and the agency could have foreclosed or sequestered the rents at any time." Maj. op. at 129 n. 10. A court, however, may not substitute its own notion of policy for that expressed by Congress. As I have obviously noted above, Congress was concerned with *deterring* equity skimming, not just with providing HUD with a substitute for foreclosure proceedings. The House Report reflects a congressional determination that civil remedies were insufficient. Thus, the very civil remedies to which the majority looks in order to obviate the need for criminal sanctions were expressly deemed insufficient by the Congress that enacted section 1715z–4.

Finally, the majority relies on a 1969 letter from John W. Kopecky, Acting Associate General Counsel of HUD, to William D. Ruckelshaus, Assistant Attorney General. As the majority is forced to acknowledge, however, this letter is equivocal at best. In fact, Kopecky's letter admits that "the clause [in section 1715z–4(b)(2) that reads] 'or is not otherwise covered by such regulation' might be construed to cover any diversion under a project mortgage after default." Joint appendix at A–56. While finding the initial portion of Kopecky's letter to be "probative" and entitled to serious consideration, the majority declines to find the concluding portion of Kopecky's letter, which is unfavorable to the majority's argument, to be either probative or entitled to consideration. *Compare* maj. op. at 127–28 n. 7 *with id.* at 128 n. 8. I am perplexed as to why selected segments of the same document are characterized so differently.

In any case, this opinion letter does not constitute the sort of agency interpretation entitled to deference—especially given the literal terms of the statute and the position taken by HUD in supporting this prosecution. *See Garcia v. United States,* 469 U.S. 70, 105 S.Ct. 479, 484–85, 83 L.Ed.2d 472 (1984).

### III.

The majority goes on to hold that, even if its statutory arguments are not accepted, a dismissal of the indictment would still be required because "potential criminal defendants must be accorded fair notice of the proscribed conduct." Maj. op. at 128.[6]

In a case where the defendants have concededly diverted rental payments from Golden Acres to their own use while the mortgage was in default, I find it difficult to believe that they were unaware that such conduct was proscribed. Certainly had the Capanos renegotiated their mortgage with HUD such an argument would be given short shrift. They did not do so, but nevertheless continued to skim equity from the property that was now the security for a defaulted mortgage held by HUD itself. Surely, their mere failure to renegotiate the terms of their mortgage should not insulate them from criminal penalties. As I have earlier argued, a plain reading of the statute would alert any lay person, even one without the business sophistication of the Capanos, to the fact that penalties would be imposed on any owner who used the Golden Acres revenues for personal benefit rather than to discharge the owner's mortgage obligations.

### IV.

Because I believe that section 1715z–4 of the statute clearly criminalizes equity skimming from property that is security for a HUD mortgage regardless of whether or not an extension or a modification of the mortgage has been sought, granted, or denied, I would reverse the judgment of the

---

**6.** Although the majority opinion disclaims reliance on ostensible redeeming features of Capano's conduct, it curiously refers to several circumstances underlying Joseph Capano's acquisition of ownership of Golden Acres, Inc. These factual assertions are found only in Capano's appellate brief. These circumstances are not a part of the record before the district court on a motion to dismiss an indictment and therefore may not play any part in our decision of this case.

district court which dismissed the indictments and reinstate the indictments against the Capanos. I therefore respectfully dissent.

### APPENDIX

Subsection (a) of section 1715z–4 provides, in pertinent part:

The Secretary shall not consent to any request for an extension of the time for curing a default under any mortgage covering multifamily housing, as defined in the regulations of the Secretary, or for a modification of the terms of such mortgage, except in conformity with regulations prescribed by the Secretary in accordance with the provisions of this section. Such regulations shall require, as a condition to the granting of any such request, that, during the period of such extension or modification, any part of the rents or other funds derived by the mortgagor from the property covered by the mortgage which is not required to meet actual and necessary expenses arising in connection with the operation of such property, including amortization charges under the mortgage, be held in trust by the mortgagor and distributed only with the consent of the Secretary; ...

12 U.S.C. § 1715z–4(a).

Section 1715z–4(b) establishes criminal penalties for:

Whoever, as an owner of a property which is security for a mortgage described in subsection (a) of this section ... (2) if such mortgage is determined, as provided in subsection (a) of this section, to be exempt from the requirement of any such regulation or is not otherwise covered by such regulation, willfully and knowingly uses or authorizes the use, while such mortgage is in default, of any part of the rents or other funds derived from the property covered by such mortgage for any purpose other than to meet actual and necessary expenses arising in connection with such property....

12 U.S.C. § 1715z–4(b).

The regulations issued under subsection (a) read as follows:

(a) The mortgagor and the mortgagee may, with the approval of the Commissioner, enter into an agreement which extends the time for curing a default under the mortgage or modifies the payment terms of the mortgage.

(b) The Commissioner's approval of the type of agreement specified in paragraph (a) of this section shall not be given unless the mortgagor agrees in writing that, during such period as payments to the mortgagee are less than the amounts required under the terms of the original mortgage, it will hold in trust for disposition as directed by the Commissioner all rents or other funds derived from the property which are not required to meet actual and necessary expenses arising in connection with the operation of such property, including amortization charges under the mortgage.

(c) The Commissioner may exempt a mortgagor from the requirement of paragraph (b) of this section in any case where the Commissioner determines that such exemption does not jeopardize the interests of the United States.

24 C.F.R. § 207.256b (1985).