UNITED STATES of America

v.

**Franklyn C. NOFZIGER, Appellant.**

No. 88–3058.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1988.

Decided June 27, 1989.

Rehearing and Rehearing En Banc Denied Sept. 5, 1989.

Andrew L. Frey, with whom Robert Plotkin, E. Lawrence Barcella, and Sandra L. Wilkinson, Washington, D.C., were on the brief, for appellant.

Richard A. Friedman, Associate Independent Counsel, with whom James C. McKay, Independent Counsel, and Newman T. Halvorson, Associate Independent Counsel, Washington, D.C., were on the brief, for appellee.

Before EDWARDS, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge EDWARDS.

BUCKLEY, Circuit Judge:

Franklyn C. Nofziger, former Assistant to the President for Political Affairs, appeals his conviction for violation of the Ethics in Government Act. We hold that under the section of the Act that Nofziger was convicted of violating, the government was required to prove that he had knowledge of all of the facts making his conduct criminal. Because the government offered no evidence demonstrating that Nofziger possessed such knowledge, we reverse his conviction.

### I. BACKGROUND

#### A. Statutory Context

In 1987, former presidential aide Franklyn C. Nofziger was convicted on three counts of communicating with officials at the White House in violation of subsection 207(c) of the Ethics in Government Act, 18 U.S.C. § 207(c). Congress adopted that subsection in 1978 as a result of a recommendation by President Jimmy Carter that it enact legislation to "strengthen existing restrictions on the revolving door between government and private industry." He proposed that Congress do so by extending the period prohibiting certain contacts between a former official and his agency and by adopting a "new and broader ban on formal or informal contact on other matters with agencies of former employment,

for a period of 1 year after the end of government service." Message from the President Transmitting Proposed Ethics in Government Act of 1977, *reprinted in* H.R.Rep. No. 800, 95th Cong., 1st Sess. 85 (1977) ("House Report").

To accomplish this second objective, President Carter proposed adding a second offense, that of communicating with an agency of former employment about certain matters, to the existing offense of acting as an agent or attorney for another person in proceedings before such an agency. That second offense is set forth in subparagraph (2) of a new subsection 207(c) proposed in the draft legislation submitted with the President's message ("Administration draft"). It reads, in relevant part, as follows:

> Whoever, having been so employed ..., within one year after his employment with the department or agency has ceased, knowingly—
>
> > (1) acts as agent or attorney for or otherwise represents any other person (except the United States) in any formal or informal appearance before, or
> >
> > (2) makes any contact on behalf of any other person (except the United States) with the intent to influence the department or agency in which he served as an officer or employee, or any officer or employee thereof, in connection with any ... particular matter which is pending before such department or agency or in which such department or agency is a party or has a direct and substantial interest—
> >
> > Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

House Report at 96. After considering alternative Senate and House of Representative versions of the Carter recommendation, Congress adopted the present language of subsection 207(c):

> Whoever, [being a covered government employee], within one year after such employment has ceased, knowingly acts as agent or attorney for, or otherwise represents, anyone other than the United States in any formal or informal appear-

ance before, or, with the intent to influence, makes any oral or written communication on behalf of anyone other than the United States, to—

> (1) the department or agency in which he served as an officer or employee, or any officer or employee thereof, and

> (2) in connection with any ... particular matter, and

> (3) which is pending before such department or agency or in which such department or agency has a direct and substantial interest—

shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

18 U.S.C. § 207(c) (1982).

The principal dispute in this case is over the reach of the word "knowingly." Appellant Nofziger argues that the word modifies the entire sentence of which it is a part and thus requires knowledge of the specific circumstances that make the communication unlawful. The government contends that "knowingly" applies only to the offense described in the adjacent "appearance clause" (i.e., the clause that refers to an ex-official's acting as agent or attorney in an appearance before a former agency) and not to that described in the "communication clause" (i.e., the clause that refers to any oral or written communication by such an official to his former agency).

This is not an idle grammatical inquiry. If Nofziger's interpretation is correct, no one may be convicted under subsection 207(c) unless it is proven that he had knowledge of each of the facts constituting the offense. On the other hand, under the government's interpretation, if an ex-official tries to interest his former agency in a particular project in the *mistaken* belief that it had no "direct and substantial interest" in it, he will have committed a felony punishable by up to two years in jail.

## B. Factual Background

On July 16, 1987, a grand jury indicted appellant Nofziger on four counts alleging violations of subsection 207(c) and two counts alleging violations of subsection 207(a). On its own motion, the government later sought and obtained dismissal of the subsection 207(a) counts. Trial on the remaining counts began on January 11, 1988. The court submitted the case to the jury on February 10, 1988, and on February 11 the jury returned its verdict finding Nofziger guilty on three of the counts. On April 8, 1988, the trial court sentenced Nofziger to consecutive terms of imprisonment of two to eight months on each of the three counts and levied fines totalling $30,000. All but thirty days of each term were suspended, leaving a sentence of ninety days' imprisonment. The district court stayed the execution of appellant's sentence pending this appeal.

Nofziger served as Assistant to the President for Political Affairs in the Reagan White House for exactly one year beginning January 21, 1981. After resigning his position, he and a business associate, Mark Bragg, established the government relations and political consulting firm of Nofziger–Bragg Communications. The three counts upon which Nofziger was convicted alleged that certain lobbying undertaken by Nofziger on behalf of three of his firm's clients violated subsection 207(c).

First, the grand jury found that Nofziger violated the Act by sending a letter dated April 8, 1982 to Edwin Meese III, then Counselor to the President, urging the White House to support the Welbilt Electronic Die Corporation in its efforts to secure a contract from the Army for the manufacture of more than 13,000 small engines. Welbilt was a minority-owned business located in the South Bronx, an economically distressed area of New York City. Pursuant to a program granting special benefits to minority-owned businesses, the Small Business Administration ("SBA") designated Welbilt as the only company eligible to negotiate for the engine contract under a special minority enterprise set-aside program. The Army had authority to withdraw the engine contract from the program and to solicit competitive bids from other companies if the Army, Welbilt, and the SBA could not agree on a price for the engines that was satisfactory to the Army.

Nofziger's letter informed Meese that Welbilt was "having some problems with the Army" and advised Meese that in light of President Reagan's commitment to the revitalization of the South Bronx, "it would be a blunder not to award [the engine] contract to Welbilt."

Second, the grand jury concluded that Nofziger violated subsection 207(c) by forwarding to James E. Jenkins, then Deputy Counselor to the President, a copy of a letter that Nofziger had previously sent to the president of the National Marine Engineers Beneficial Association, AFL–CIO ("MEBA"), a labor union representing licensed maritime officers. On this copy, Nofziger appended a note advising Jenkins that MEBA's president had supported "all the President's endeavors" and urging Jenkins to help MEBA by securing "civilian manning," i.e., the use of civilian crews on noncombat navy vessels.

Third, the grand jury found that Nofziger violated the Act through his efforts on behalf of the Fairchild Republic Corporation ("Fairchild"), a division of Fairchild Industries, Inc. Fairchild's main product was the A–10 antitank aircraft. Prior to 1982, the Air Force had purchased a number of A–10's, but, contrary to the President's budget request, Congress did not authorize the expenditure of any money for A–10 purchases for Fiscal Year ("FY") 1983. On August 20, 1982, the President addressed a memorandum to Secretary of Defense Caspar Weinberger in which he urged the Secretary to encourage export sales of the A–10 or take other measures to keep the aircraft in production at the level requested in the President's FY 1983 budget. The grand jury found that Nofziger illegally encouraged White House officials to implement the President's directive when Nofziger met with members of the National Security Council staff on or about September 24, 1982.

Prior to trial, Nofziger filed a series of motions challenging his indictment on various grounds and seeking forms of pre-trial relief, all of which were denied. *See United States v. Nofziger*, Crim.Action No. 87–0309 (D.D.C. Nov. 10, 1987) ("Memorandum Opinion"). Following his conviction, Nofziger moved for judgment of acquittal or, in the alternative, for a new trial—again without success. *See United States v. Nofziger*, Crim.Action No. 87–0309 (D.D.C. Apr. 7, 1988).

On appeal, Nofziger challenges his conviction on the following grounds: (1) The government neither alleged, nor did it prove, that Nofziger had actual knowledge of the facts that rendered his communications unlawful under subsection 207(c); (2) the district court misconstrued the term "direct" in subsection 207(c); (3) even if one accepts the district court's construction of the subsection, the evidence was insufficient to prove that the White House had a "direct" and "substantial" interest in two of the matters that were the subject of the communications; and (4) if the district court properly construed the phrase "direct and substantial interest," the statute is unconstitutionally vague as applied to Nofziger in this case.

## II. DISCUSSION

As the district judge stated during the course of the trial,

the big problem with this case is that we are dealing with a statute that is hardly a model of clarity.

Record at 3416, *United States v. Nofziger*, Crim.Action No. 87–0309.

Stripped of all language not directly pertinent to this case, subsection 207(c) reads as follows:

Whoever, [being a covered former employee], within one year after such employment has ceased, knowingly acts as agent or attorney for, or otherwise represents, anyone other than the United States in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of anyone other than the United States, to—

(1) the agency in which he served, or any officer or employee thereof,

(2) in connection with any particular matter

(3) in which such agency has a direct and substantial interest—

shall be [subject to felony penalties].

Thus the subsection criminalizes two separate activities—that of representing someone other than the United States in an appearance before an agency of former employment ("appearance offense"), and that of communicating with the agency on behalf of such a person ("communication offense"). In each instance, the subject of the appearance or communication must be a "particular matter" that is either pending before, or of "direct and substantial interest" to, that agency.

The parties agree that an ex-official may lawfully lobby his former agency the day after he has left it with the purpose of *stimulating* its interest in a matter of importance to a private client *so long as* that matter is not already before the agency and the agency does not already have a direct and substantial interest in it. If, however, the agency should already have such an interest, the government contends that what would otherwise have been an entirely innocent communication is transformed into a felony punishable by two years in jail *even though* the former official had no knowledge of the fact. Thus, the government's interpretation would impose strict criminal liability on a lobbyist (by definition, one who communicates with the intent to influence) who is misinformed as to what matters are of current interest to his former employer. Nofziger, on the other hand, maintains that a former employee cannot be found in violation of subsection 207(c) unless it can be shown that he had knowledge that the agency had a "direct and substantial" interest in the matter.

To determine who is right, we must first decide whether, as the government claims, Congress has manifested an unambiguous intent to impose strict liability for the communication offense by limiting the reach of "knowingly" to the appearance offense, with which Nofziger is not charged. If we find the statute to be ambiguous on this point, we must then apply certain principles of construction applicable to criminal stat-

utes in order to determine whether knowledge of the operative facts is essential to a conviction under subsection 207(c).

*The question of ambiguity*

In rejecting Nofziger's contention that the word "knowingly" applies to the communication offense and requires actual knowledge of the facts that bring it into play, the district court stated:

> The court does not believe this pervasive, super-modifying role [assigned the word "knowingly"] can be reconciled with common usage. Nor can the court accept this reading without some clear indication that Congress intended such a less-than-obvious result.

Memorandum Opinion at 22. We begin by examining the statutory language to see whether, as the court suggests, the question can be resolved through an appeal to common usage.

Adverbs frequently modify strings of clauses. In *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), the Supreme Court was required to interpret a federal statute dealing with food stamp fraud. The key provision, section 2024(b)(1), penalizes anyone who

> knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations.

7 U.S.C. § 2024(b)(1) (1982). The question at issue in *Liparota* was whether the adverb "knowingly" applied only to the verbs that it preceded or whether the government had to prove that the defendant also knew that his actions were not authorized by the statute or the regulations. The Court determined that section 2024(b)(1) was unclear in this regard: "Either interpretation would accord with ordinary usage." *Id.* at 424, 105 S.Ct. at 2087. Two circuits independently reached the same conclusion when called upon to interpret the same provision. In *United States v. Marvin*, the Eighth Circuit stated:

> To read "knowingly" as having nothing to do with the phrase "in any manner not authorized" is, we suppose, verbally tenable, but it is not the only meaning the

words will bear, not even, we think, the more natural one.

687 F.2d 1221, 1226 (8th Cir.1982). *See also United States v. O'Brien*, 686 F.2d 850, 852 (10th Cir.1982) (the section "is ambiguous. The statute can be read either way.").

The Third Circuit's decision in *United States v. Johnson & Towers, Inc.*, 741 F.2d 662 (3d Cir.1984), is also instructive. In *Johnson*, the court was required to interpret a criminal statute that applied to any person who

> (2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter either—
>
>> (A) without having obtained a permit under section 6925 of this title ... or
>>
>> (B) in knowing violation of any material condition or requirement of such permit.

At issue was whether the requisite knowledge was limited to the acts of treating, storing, and disposing. The court concluded, on the basis of its textual analysis, that "knowingly" applied to both subparts (A) and (B), declaring that "[a]s a matter of syntax we find it no more awkward to read 'knowingly' as applying to the entire sentence than to read it as modifying only 'treats, stores or disposes.'" 741 F.2d at 668.

These cases are distinguishable, of course, because the statutory provisions with which they deal do not have inserted in them, as in this case, a separate offense that is subject to its own distinct mental state, namely, the intent to influence. We suggest, however, that this is a distinction without a difference. If one removes the communication offense and its "intent to influence" modifier from subsection 207(c), the resulting text, reduced to essentials, will read as follows:

> Whoever, [being a covered government employee], within one year after such employment has ceased, knowingly acts as agent or attorney for, or otherwise represents, anyone other than the United States in any formal or informal appearance before the agency in which he

served in connection with any particular matter in which such agency has a direct or substantial interest shall be [subject to felony penalties].

Clearly, such a provision would be indistinguishable, syntactically, from the provisions in the cited cases that the Supreme Court and the Third, Eighth, and Tenth Circuits found to be ambiguous. Thus "knowingly" can reasonably be read to apply to all elements of the appearance offense, including the "direct or substantial interest" element that is common to both offenses. Similarly, if one deletes the appearance clause, the resulting language ("whoever ... knowingly, with the intent to influence, makes any oral or written communication ... in connection with a particular matter") clearly permits the inference that "knowingly" attaches to all elements of the communication offense.

It is the government's position, however, that subsection 207(c) is distinguishable from the provisions at issue in *Liparota* and *Johnson* because of the particular manner in which the appearance and communication offenses are handled. The government argues that the subsection's grammar, syntax, and punctuation compel the conclusion that Congress intended to limit the requirement of actual knowledge to the clause immediately following the word "knowingly." We quote the analysis presented in the government's brief in its entirety:

> First, the common element of both offenses that immediately precedes the appearance clause—"within one year after such employment has ceased"—is closed with a comma, which plainly marks the end of that element and the beginning of the appearance clause. Second, the appearance clause and the communication clause have a parallel structure: each begins with its mental element, each ends with a preposition relating it to the other common elements of both offenses, and each repeats the "on behalf of" phrase. Finally, the appearance clause and the communication clause are sepa-

rated with a conjunction, "or," double bracketed with commas.

Government's Brief at 19–20.

The government maintains, further, that this linguistic analysis is compelled by subsection 207(c)'s legislative history, which we will examine before returning to the analysis itself. The government places particular reliance on the Report of the Conference Committee that considered the alternative versions of subsection 207(c) that had been adopted by the Senate and the House of Representatives. That report provides the following paraphrase of "the two elements," i.e., the independent appearance and communication offenses, contained in the House's version of the subsection:

> a former official who—
>
> (a) "knowingly acts as agent or attorney ... or otherwise represents ... in any formal or informal appearance before,";
>
> (b) "or, with the intent to influence, make[s] any written or oral communication ... to ... ."

H.R.Rep. No. 1756, 95th Cong., 2d Sess. 74 (1978), U.S.Code Cong. & Admin.News 1978, pp. 4216, 4390 ("Conference Report") (ellipses in original). The Conference Report describes the Senate version of subsection 207(c) as covering

> any former official, who "knowingly—(1) makes any appearance or attendance before, or (2) makes any written or oral communication to, and with the intent to influence the action of ... ."

*Id.* at 74–75 (ellipsis in original), U.S.Code Cong. & Admin.News 1978, pp. 4390, 4391.

The government notes that in reporting the adoption of the House provision, the Conference Report states: "It is understood that the two elements of the House language, as set forth above, are each independent of the other for the purposes of a violation of any subsection in which those terms appear" (referring to the fact that subsections 207(a), (b), and (c) contain identical language describing the appearance and communication offenses). *Id.* at 74, U.S.Code Cong. & Admin.News 1978, p. 4390. Because, in the Conference Report's

paraphrase of the House alternative, the word "knowingly" appears as an integral part of the first element, the government concludes that the conferees' adoption of the House version reflected a conscious decision to limit the application of "knowingly" to the appearance clause. However appealing this argument, we must keep in mind that Congress codified the provision submitted by the House, not the paraphrase.

The only other support for its conclusion that the government offers from legislative history is a single exchange, on the House floor, between Congressmen Wiggins and Danielson. The former sought to delete the communication offense because it would "expand the scope of section 207 significantly"; the latter defended its inclusion by noting that the communication offense required an "intent to influence." 124 Cong.Rec. 32,008 (1978). Because Congressman Danielson failed to *state* that the offense must also occur knowingly, the government concludes that Congress could not have *intended* that the offense be so qualified. What the reference to this exchange illustrates is not Congress' state of mind but, rather, why such gleanings from the *Congressional Record* should be rejected in any serious attempt to interpret an act of Congress. *Cf. International Bhd. of Elec. Workers, Local Union 474 v. NLRB,* 814 F.2d 697, 715 (D.C.Cir.1987) (Buckley, J., concurring).

We begin our analysis of subsection 207(c) with its genesis, which was President Carter's proposal that Congress broaden the scope of the Ethics in Government Act by adding a second offense to the appearance offense that was then the subject of section 207. That new offense was defined, in the Administration's draft of subsection 207(c) (which is more fully quoted at page 443 above), as

> mak[ing] any contact on behalf of any *other* person (except the United States) with the intent to influence the department or agency [with which the covered official had formally served with respect to any matter] which is pending before such department or agency or in which

such department or agency is a party or *has a direct and substantial interest. Id.* at 96 (emphasis added). Thus the communication offense as framed in the President's proposal would permit self-representation and include, among the matters as to which contact was to be prohibited, those in which the department or agency had a "direct and substantial interest."

The Senate and House Judiciary Committees held hearings on the President's proposal, and each body adopted versions of the Administration draft that were then referred to the Senate–House Conference Committee. The Senate version retained the format used in the Administration draft ("knowingly—(1) makes any appearance or attendance before, or (2) makes any written or oral communication to, and with the intent to influence the action of ..."), broadened the scope of the prohibited communication to include self-representation, and eliminated the Administration's reference to matters that were of "direct and substantial interest" to the department or agency in question. The House version, on the other hand, adopted the format now enacted into law ("knowingly acts as agent or attorney ... in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication ...") and retained the Administration's language permitting self-representation and its reference to matters of direct and substantial interest to an agency.

These were the textual differences with which the conference was required to deal. The Conference Report offers no clue as to the nature of the discussion between the Senate and House conferees. It merely reports the way they resolved the differences:

> The conference adopted the House prohibition, with the modification that 18 U.S.C. 207(c) will include self-representation. The conference also adopted the House language, contained in subsection (c)(3), to prohibit contact by a former official with his former agency, either on matters pending before that agency or on matters in which the former agency has a direct and substantial interest. Thus

contact is proscribed, ... provided that the agency has a "direct and substantial interest" therein.

*Id.* at 75, U.S.Code Cong. & Admin.News 1978, p. 4391. If the conferees decided to adopt the House format with the conscious purpose of restricting the application of the adverb "knowingly" to the appearance clause, the Conference Report fails to record that critical fact even though it takes specific note of their decision to retain the Senate's prohibition against self-representation and the House's inclusion of matters in which an agency has a "direct and substantial interest."

It seems to us that a likely explanation for the Conference Report's failure to ascribe any reason for the selection of the House's format rather than the Senate's is that the differences between the two were viewed as stylistic rather than substantive. This explanation is not at necessary odds with the manner in which the Conference Report has paraphrased the House proposal: "(a) 'knowingly acts as agent ... in ... appearance before'; (b) 'or, with the intent to influence, make[s] any written or oral communication....'" That formulation is first used in the Conference Report's discussion of the "Prohibition under 18 U.S.C. 207(a) (lifetime ban)," in which "[t]he two elements of the House amendment" (the appearance and communication offenses) are contrasted with the single element (the appearance offense) contained in the Senate amendment to subsection 207(a). *Id.* at 74, U.S.Code Cong. & Admin.News 1978, p. 4390. The Conference Report then states that "[i]t is understood that the two elements of the House language, as set forth above, are each independent of the other for the purposes of a violation of any subsection in which those terms appear." *Id.*

The focus of the Conference Report thus seems to be on affirming that the conferees agreed that both elements of the House version of subsection 207(a) were to be included in subsections 207(b) and (c) as well. This purpose, however, falls well short of implying a concomitant decision to eliminate the requirement of actual knowledge of the circumstances giving rise to the offenses. We believe the Report's para-

phrase of the House and Senate versions can as readily be explained as simply the way in which a member of the committee staff chose to highlight the facial differences between the two.

Similarly, the grammar, syntax, and punctuation of the final versions of subsection 207(c) can readily be explained in terms of simple editing. If we begin with the Administration draft (see text at page 3 above), blue-pencil the dash after the word "knowingly" and the numbers used to identify the two separate offenses, and then move the phrase "with the intent to influence" from the end of the communication clause to its beginning, we have the House version—grammar, syntax, commas, and all. We are not persuaded that such relatively minor editorial changes imply a substantive rather than a stylistic purpose. What these changes *have* accomplished is to strand the *mens rea* "knowingly" in a grammatical no man's land in which it is uncertain whether it applies to both offenses (as would have been the case if the dash in the White House draft had been retained), or just the appearance offense (which would have been clear had Congress chosen to codify the Conference Report's paraphrase of the House version of subsection 207(c)). As Congress followed neither course, we are left with language that is as amenable to one interpretation as the other.

The government nonetheless argues that the parallel structures of the appearance and communication clauses, as it reads them, require that each be allocated one of the two *mens rea* specified in subsection 207(c). The implication appears to be that *because* the communication clause is subject to the specific "intent to influence" requirement, it cannot at the same time be subject to the "knowingly" requirement. There is nothing in law or logic, however, to suggest that a specific *mens rea* cannot coexist with one or more general application.

The Model Penal Code provides several analogies that would support the applicability of both *mens rea* requirements to the communications offense. For example,

section 221.1(1) of the Code states that a person "is guilty of burglary if he enters a building ... with purpose to commit a crime therein." Section 221.1(2) further provides that "[b]urglary is a felony of the second degree if it is perpetrated in the dwelling of another at night." The comments to the Code make clear that notwithstanding the requirement of a specific purpose, the culpability required as to the other elements of the crime is satisfied if the person acted "purposefully, knowingly or recklessly." See Model Penal Code § 2.02(3) (culpability requirement in absence of specific provision). As explained in Comment 6 to section 2.02:

> Since an actor must have a "purpose" to commit a crime within a building to be guilty of burglary when he enters the building, the definition of the offense might be thought to be ambiguous as to what culpability level applies to elements like "dwelling house" and "night." Must the actor know that he is entering a dwelling house in order to be convicted of a second degree felony, or is some lesser culpability level sufficient?
>
> Section 2.02(3) [the default culpability provision] should control elements of this character, and therefore recklessness should suffice in the absence of special provision to the contrary.... In the burglary illustration, the phrase "with purpose to commit a crime therein" plainly does not make purpose the required level of culpability with respect to all material elements of the offense.

The Code contains several other provisions that specify certain purposes that are separate from the culpability required for the other elements of the offenses. *See, e.g.,* § 223.2 (Theft by Unlawful Taking or Disposition); § 224.2 (Simulating Objects of Antiquity, Rarity, etc.); § 224.3 (Fraudulent Destruction, Removal or Concealment of Recordable Instruments). In all but one of these sections, the purpose requirement is set apart from the rest of the language by commas, just as the "intent to influence" requirement is in subsection 207(c) of the Ethics in Government Act. Thus, in the case at hand, a requirement that the communication be made with the "intent to

influence" is not inherently incompatible with a parallel requirement that the other elements of the communication offense be subject to the "knowingly" *mens rea.*

The only other comment we would make about the government's interpretation of subsection 207(c) is that it seems highly unlikely that the conferees would have chosen to limit the scope of "knowingly" to the narrow act of serving as an agent or attorney for, or otherwise representing a party in a formal or informal appearance before a government agency. It is hard to believe that anyone could act in such a capacity with other than full knowledge. At oral argument, counsel for the government suggested that this restrictive application of the word could be explained as dealing with the possibility that a former official might be found to have made an appearance as the implied, or unwitting, agent for someone else. But as the American Civil Liberties Union noted in its *amicus* brief, "it hardly seems likely that this improbable scenario is what Congress had in mind when it added 'knowingly' to the statute. Much more plausible is the conclusion that Congress intended to require knowledge of the circumstances that made an appearance or communication unlawful." ACLU Brief at 6–7.

We note, finally, that an Office of Government Ethics ("OGE") interpretation of identical language in subsection 207(b), issued February 1, 1980 (*see* 45 Fed.Reg. 7412 (1980)), buttresses our conclusion that the grammar, syntax, and punctuation of subsection 207(c) do not require acceptance of the government's view that the word "knowingly" can only apply to the appearance clause. Although the OGE, which is charged with administering the Ethics in Government Act, has not issued any regulation interpreting subsection 207(c), it has issued one interpreting subsection 207(b)(i), which applies to

> whoever having been so employed [in certain jobs enumerated in subsection 207(a) ], within two years after his employment has ceased, *knowingly acts as agent or attorney for, or otherwise represents, any other person (except the United States), in any formal or infor-*

> *mal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person (except the United States* ) to [an agency in connection with a matter in which the agency has a direct and substantial interest and which was actually under his official responsibility within one year of his termination.]

18 U.S.C. § 207(b)(i) (1982) (emphasis added).

The OGE regulation states that subsection 207(b)(i) is inapplicable "unless at the time of the proposed representation ... [the former employee] *knows or learns* that the matter had been under his or her responsibility." 5 C.F.R. § 737.7(b)(4) (emphasis added). In other words, the OGE interprets the word "knowingly," in subsection 207(b)(i), as applying not just to the phrase "acts as agent, or attorney for, or otherwise represents," but to the circumstances that make the representation unlawful. While it is true, as the government points out in its brief, that the regulation deals with another subsection, the language being interpreted is identical in both subsections. Moreover, the OGE's interpretation is entitled to deference. *Cf. E.I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed. 2d 100 (1977) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) (following " 'venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong' ").

Although not charged with administering the Act, on April 18, 1980 (*see* 45 Fed.Reg. 26,326 (1980)), the Department of Justice ("DOJ") issued a regulation interpreting subsection 207(c) that also supports Nofziger's reading. As interpreted by the DOJ, subsection 207(c) provides that

> [no covered employee] shall, within one year after such employment has ceased, knowingly engage in the conduct described in the next sentence. The prohibited knowing conduct is that of acting as attorney or agent ... in any formal or

informal appearance before, or with the intent to influence making any oral or written communication ... (1) to the Department of Justice, or any employee thereof, (2) in connection with any rule-making or any [other described] matter ..., and (3) which is pending before this Department or in which it has a direct and substantial interest.

28 C.F.R. § 45.735–7(d) (1988). By asserting that covered employees cannot "knowingly engage in the conduct" described in the second sentence of the above-quoted passage and then listing all the elements of subsection 207(c), the DOJ expresses its view that the subsection's requirement of knowledge applies to all elements of the subsection.

In sum, we find nothing in the text of subsection 207(c), or in its legislative history, or in official interpretations of the statute, that will support the government's contention that the subsection unambiguously limits the reach of "knowingly" to the appearance clause.

### Resolving the ambiguity

Having concluded that subsection 207(c) is ambiguous, we must next decide how to resolve the ambiguity. Two canons of statutory construction require that an ambiguous criminal statute be interpreted in the defendant's favor. The first of these is the rule of lenity: " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (citation omitted). In *Bass,* the Supreme Court emphasized the venerable position that the rule occupies in Anglo–American jurisprudence:

This principle [rule of lenity] is founded on two policies that have long been part of our tradition. First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." ... Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the

community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should."

*Id.* at 348, 92 S.Ct. at 522–23 (citations omitted). More recently, the Court noted that

[a]lthough the rule of lenity is not to be applied where to do so would conflict with the implied or expressed intent of Congress, it provides a time-honored guideline when the congressional purpose is unclear.

*Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985).

The second applicable rule states that absent evidence of a contrary legislative intent, courts should presume *mens rea* is required. *See Liparota* at 426, 105 S.Ct. at 2088 ("criminal offenses requiring no *mens rea* have a 'generally disfavored status' " (citations omitted)). This presumption so pervades our system of criminal justice that the Court "has on a number of occasions read a state-of-mind component into an offense even when the statutory definition did not in terms so provide." *United States v. United States Gypsum Co.,* 438 U.S. 422, 437, 98 S.Ct. 2864, 2873, 57 L.Ed. 2d 854 (1978) (government must prove intent as element of criminal antitrust case even though Sherman Act silent on *mens rea* ). As Justice Jackson explained, in speaking of the common law tradition, *mens rea*

is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

*Morissette v. United States,* 342 U.S. 246, 250–51, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). In contrast to civil liability, a criminal conviction expresses society's condemnation of culpable conduct; therefore,

[u]sually the stigma of criminal conviction is not visited upon citizens who are not morally to blame because they did not know they were doing wrong. If

Congress wishes to depart ·from that norm, it may do so, but in general it must manifest its intention by "affirmative instruction."

*United States v. Marvin,* 687 F.2d 1221, 1226 (8th Cir.1982) (quoting *Morissette* 342 U.S. at 273, 72 S.Ct. at 255).

For two reasons, the presumption of *mens rea* is particularly strong in the context of subsection 207(c). First, the offense involves a felony. *See United States v. O'Brien,* 686 F.2d 850, 853 (10th Cir. 1982) (general rule especially applicable when felony charged). Second, the presumption carries particular force where "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." *Liparota,* 471 U.S. at 426, 105 S.Ct. at 2088. For example, in *Liparota,* the Court applied the *mens rea* presumption because to do otherwise would, among other things, render criminal the actions of a food stamp recipient who "used stamps to purchase food from a store that, unknown to him, charged higher than normal prices to food stamp program participants." *Id.* Similarly, if we were to adopt the government's interpretation of subsection 207(c), we would criminalize the actions of any former government official who lobbies his agency on a matter in which, unknown to him, the agency has acquired a direct and substantial interest.

The government argues that even if we decide that subsection 207(c) is ambiguous as to the scope of the knowledge required of an offender, the rule of lenity and the presumption of *mens rea* are inapplicable because subsection 207(c) falls in the category of statutes penalizing "public welfare" offenses, which "depend on no mental element but consist only of forbidden acts or omissions." *Morissette,* 342 U.S. at 252–53, 72 S.Ct. at 244. Unlike the district court (*see* Memorandum Opinion at 19–21), we decline to characterize subsection 207(c) as such because the activity with which it is concerned—lobbying—differs dramatically from the kind of activity that has usually been regulated by public welfare measures. As the Supreme Court noted in *Liparota,*

[i]n most previous instances, Congress has rendered criminal a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety.

471 U.S. at 433, 105 S.Ct. at 2092. Among the cases cited by the Court was *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), where it upheld the defendant's conviction for possession of unregistered hand grenades under a statute making it criminal for a person "to receive or possess a firearm which is not registered to him." The *Freed* Court stated that the government did not have to demonstrate that the defendant knew the hand grenades were unregistered because "[t]his is a regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Id.* at 609, 91 S.Ct. at 1118. *See also United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 564–65, 91 S.Ct. 1697, 1701–02, 29 L.Ed.2d 178 (1971) (transportation of hazardous materials); *United States v. Dotterweich,* 320 U.S. 277, 280–82, 64 S.Ct. 134, 136–37, 88 L.Ed. 48 (1943) (distribution of adulterated food); *United States v. Holland,* 810 F.2d 1215, 1223–24 (D.C.Cir.1987) (characterizing statute that imposed increased penalties on drug dealers operating within 100 feet of a school as a public welfare statute because "[a] reasonable person would know that drug trafficking is subject to stringent public regulation").

The pattern that emerges from these cases is clear. They deal with matters that may be presumed to be regulated *because* of their inherent danger. The district court notwithstanding, it is not enough that subsection 207(c) is intended "to serve the public interest in honest government." Memorandum Opinion at 21. While lobbying has been subjected to increased regulation, it is not inherently dangerous and, in fact, at least insofar as it constitutes self-representation, it has been found constitutionally protected. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508,

510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972) (first amendment right to petition protects efforts to influence administrative agencies). Moreover, subsection 207(c) does not criminalize all communication with a government agency. The communication becomes illegal only if it is (1) made within a year after departure from government service (2) to one's former agency and (3) concerns a particular matter pending before the agency or in which the agency has a direct and substantial interest.

This case is therefore analogous to *Lambert v. California*, which held that a Los Angeles ordinance requiring convicted felons to register with the city within a certain time period was not a public welfare measure because failure to register upon moving to a new city is "unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957). In the case at hand, we are dealing with the commission of an act—the act of communicating with a government official with the intent to influence—that in most instances is not only benign, but constitutionally protected. Furthermore, as the doer may not have knowledge of the circumstances that render his acts criminal, one cannot assume that he will be alerted to their consequences.

A frequent justification for public welfare laws is that they cause those subjected to strict liability to exercise extreme caution. *U.S. Gypsum*, 438 U.S. at 441–42, n. 17, 98 S.Ct. at 2876 n. 17. But again, the conduct with which Nofziger is charged does not fit the pattern that justifies the imposition of strict liability. As the Supreme Court has stated, "where the conduct proscribed is difficult to distinguish from conduct permitted and indeed encouraged ... the excessive caution spawned by a regime of strict liability will not necessarily redound to the public's benefit." *Id.*

Finally, we are disinclined to treat this statute as a "public welfare" measure without clear evidence of a congressional purpose to impose strict liability because of its potential for chilling speech. If the government's interpretation of subsection 207(c) were correct, a prudent man would avoid even permissible lobbying of his former agency within one year of his departure because the existence of an unsuspected direct and substantial agency interest could convert what he believed to be a permissible communication into a felony. As counsel for the government acknowledged at oral argument, if a former official were to seek his advice on whether he should approach his former agency, "I would inform my client to stay away."

We do not need to decide whether this acknowledged inhibition might have constitutional implications, as suggested by the ACLU in its *amicus* brief, because we conclude that subsection 207(c) is not a public welfare measure. As we find no evidence that Congress intended to impose strict liability, we must be guided by the rule of lenity and the presumption of *mens rea*. These clearly require that the conviction of Nofziger be set aside because it is not based on a finding that he had knowledge of each element of the offenses charged.

As this conclusion requires reversal, we need not reach Nofziger's other challenges.

### III. CONCLUSION

Because of subsection 207(c)'s ambiguity, time-honored rules of statutory construction dictate that we interpret the subsection as requiring the government to demonstrate that Nofziger had knowledge of the facts that made his conduct criminal. The district court should have dismissed the indictment filed by the prosecution because it failed to impose this burden on the government. Accordingly, we reverse the defendant's conviction and remand to the district court for proceedings consistent with this opinion.

*So Ordered.*

EDWARDS, Circuit Judge, dissenting:

In construing a criminal act, appellate judges have no license to take "liberties with unequivocal statutory language," nor may we "manufacture ambiguity where

none exists." *United States v. Batchelder*, 442 U.S. 114, 121–22, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). The majority has labored mightily to find an ambiguity in section 207(c) of the Ethics in Government Act, and then purported to invoke an infrequently-used doctrine that "ambiguities in criminal statutes must be resolved in favor of lenity," *id.* at 121, 99 S.Ct. at 2203, to overturn the conviction of Franklyn Nofziger. But "there is no ambiguity to resolve," *id.*, and, consequently, no basis for overturning Nofziger's conviction.

Section 207(c) sets forth two criminal offenses, prohibiting former high-ranking government employees from (1) "appearing" before *and* (2) "communicating" with their former agencies, as follows:

> Whoever, [being a covered government employee], within one year after such employment has ceased, [1] knowingly acts as agent or attorney for, or otherwise represents, anyone other than the United States in any formal or informal appearance before, *or,* [2] with the intent to influence, makes any oral or written communication on behalf of anyone other than the United States, to—[his former agency concerning a particular matter pending before or of direct and substantial interest to that agency]—[is subject to felony penalties].

18 U.S.C. § 207(c) (1982) (brackets and emphasis added). The language of the statute clearly indicates that "knowingly" is the *mens rea* requirement only for the "appearance offense," while "with the intent to influence" is the *mens rea* requirement for the "communication offense."

During the congressional debates leading to the enactment of the Ethics in Government Act, the Senate and House versions of section 207(c) were significantly different on the *mens rea* requirement. As stated in the Conference Report, the Senate bill covered

> any former official, who "knowingly—(1) makes any appearance or attendance before, or (2) makes any written or oral communication to, and with the intent to influence the action of...."

H.R.REP. NO. 1756, 95th Cong., 2d Sess. 74 (1978), U.S.Code Cong. & Admin.News 1978, pp. 4216, 4390. The Senate bill thus made "knowingly" the *mens rea* requirement for both offenses. The House bill, on the other hand, set forth "two elements," *id.*, covering a former official who

> (a) "knowingly acts as agent or attorney ... or otherwise represents ... in any formal or informal appearance before,";
> (b) "or, with the intent to influence, make[s] any oral or written communication ... to...."

*Id.* at 74–75, U.S.Code Cong. & Admin. News 1978, pp. 4390, 4391. The House bill thus provided that "knowingly" was the *mens rea* requirement *only* for the appearance offense.

At the conclusion of the congressional debates, "[t]he conference adopted the House prohibition." *Id.* at 75, U.S.Code Cong. & Admin.News 1978, 4391. Thus, the House version of section 207(c) is the one that was enacted into law.

The lack of dispute over the meaning of section 207(c) is highlighted even further in the Conference Report, for it says, in no uncertain terms, that Congress

> understood that the two elements of the House language, as set forth above, are each independent of the other for the purposes of a violation of any subsection in which those terms appear.

*Id.* at 74, U.S.Code Cong. & Admin.News 1978, p. 4390. There can be no plainer indication of congressional intent.

With only a blithe invocation of the rule of lenity, the majority disregards the clear terms of the statute and ignores the clear expressions of congressional intent. The majority opinion thus enters the dangerous territory of judicial legislating. The doctrine of separation of powers proscribes any judicial rewriting of otherwise valid congressional statutes. The criminal justice process is sufficiently flexible to accommodate "quirks" in the system, through devices such as the exercise of prosecutorial discretion, plea bargaining arrangements, sentencing determinations and, sometimes, even through the questionable means of "jury nullification." But

"judicial nullification" is not a permissible way to ameliorate the consequences of a criminal prosecution. Quite simply, judges have "no justification for taking liberties with unequivocal statutory language." *Batchelder*, 442 U.S. at 121–22, 99 S.Ct. at 2203. In my view, the majority's invocation of the rule of lenity in this case is nothing more than impermissible "judicial nullification."

In order to fully understand the overreach of the majority's decision, one must understand how very rarely the rule of lenity is actually implemented. Indeed, as described by our former colleague, now Justice Scalia, when rejecting application of the rule of lenity to a criminal statute brought by a former congressman in *United States v. Hansen*, 772 F.2d 940 (D.C.Cir. 1985), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986), the rule "in truth ... provides little more than atmospherics, since it leaves open the crucial question—almost invariably present—of how much ambiguousness constitutes ... ambiguity." 772 F.2d at 948.

Although the rule is a widely accepted theoretical notion, my review of the nearly one hundred federal cases in which reviewing courts in the last ten years have paid lip service to the principle reveals that, almost without exception, courts have found the rule to be altogether *inapplicable* to the facts before them. In the rare cases in which it has been applied, the rule has most often been used only in its "corollary" function, *i.e.*, to decrease the extent of the punishment attached to a single conviction, rather than to overturn a conviction or an entire statute. *See, e.g., Simpson v. United States*, 435 U.S. 6, 15–16, 98 S.Ct. 909, 914–15, 55 L.Ed.2d 70 (1978); *United States v. Grant*, 816 F.2d 440 (9th Cir. 1987). In fact, I could find only three cases in the last decade in which a reviewing court invoked the rule of lenity to overturn

a criminal conviction based solely upon a finding that the statute under which a defendant was convicted was too vague or ambiguous to support a conviction.[1] *See Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985); *United States v. Capano*, 786 F.2d 122 (3d Cir.1986); *United States v. Graham Mortgage Corp.*, 740 F.2d 414 (6th Cir.1984).

I have indulged this brief review of the case law to make a singular point: although no one would deny that the specter of the rule of lenity has had a significant impact on the operation of our democracy, the rule always has been used with the greatest circumspection. Historically, judges have applied it only in the *most egregious cases* of careless legislative drafting, *i.e.*, where a criminal defendant has had no fair notice of proscribed conduct because it is not possible to comprehend the meaning of the criminal statute under which the defendant has been charged. The rule of lenity has been so narrowly applied because, in our system of government, we do not tolerate judicial rewriting of otherwise validly enacted criminal statutes. We recognize that if the rule of lenity is loosely applied, this will result in perhaps the most dangerous form of judicial activism, where "how much ambiguousness constitutes ambiguity" will be a matter of judicial whim.

Because I am unwilling to join the majority's intrusion into a sphere properly reserved for Congress, I dissent.

## I.

As the Supreme Court has consistently repeated, "the 'touchstone' of the rule of lenity 'is statutory ambiguity.'" *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *accord Lewis v. United States*, 445 U.S. 55, 65, 100 S.Ct. 915, 921, 63 L.Ed.2d 198 (1980); *Batchelder*, 442 U.S. at 121–22, 99

---

**1.** Admittedly, the rule sometimes has been invoked as a *buttressing* argument when an acquittal was deemed appropriate for other reasons. *See, e.g., United States v. McGoff*, 831 F.2d 1071, 1095–96 (D.D.Cir.1987) (affirming dismissal of criminal charges as time-barred primarily because compelled by the statute of

limitations language, and because even if the statute were ambiguous, court would find for criminal defendant); *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 166 n. 4 (2d Cir. 1978) (affirming acquittal based on clear language of the larceny statute under which defendant was charged).

S.Ct. at 2203; *Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974). The Court elaborated in *Huddleston* that the rule of lenity

> is rooted in the concern of the law for individual rights, and in the belief that fair warning should be accorded as to what conduct is criminal and punishable by deprivation of liberty or property.... The rule is also the product of an awareness that legislators and not the courts should define criminal activity. *Zeal in forwarding these laudable policies, however, must not be permitted to shadow the understanding that "[s]ound rules of statutory interpretation exist to discover and not to direct the Congressional will."*

415 U.S. at 831, 94 S.Ct. at 1272. (emphasis added) (citations omitted). To my mind, the language and structure of section 207(c) reveal no ambiguity or uncertainty, making the rule of lenity completely irrelevant in this case.

The purported "ambiguity" troubling the majority is mystifying to me, because the basics of grammar and punctuation so clearly teach that the qualifying adverb "knowingly" only modifies the "appearance offense," not the "communication offense," under section 207(c). This being the case, we must enforce the statute "according to its terms," *United States v. Ron Pair Enterprises*, —— U.S. ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), and pursuant to the reasonable interpretation "mandated by [its] grammatical structure." *Id.*

The *Ron Pair* Court found that the setting aside of one statutory clause by commas resulted in that phrase "stand[ing] independent[ly] of the language that follows." *Id.* 109 S.Ct. at 1031. A similar analysis is appropriate in the case before us. From a purely grammatical perspective, the comma that follows "appearance before" is a "stop," which ends the first of the enumerated offenses; the comma following "United States" signals the end of the second offense. This choice of punctuation serves to create two independent clauses, each, consistent with the demands of parallel construction, incorporating its own adverbial "intent" modifier: "knowingly" is the adverbial modifier of the "appearance offense" and "with intent to influence" is the adverbial modifier of the "communication offense." As the trial court properly found, in any ordinary reading of such a sentence, "knowingly" does not modify "with intent to influence"; to read otherwise would ignore or distort the statute's punctuation.

The statute includes *two* intent modifiers for *two* offenses. An ordinary reading affiliates one modifier with one offense, not two modifiers with one offense and one with the other offense. If the latter were intended, additional punctuation would be required. For example, another "stop"— *e.g.*, a colon or dash—after "knowingly" would indicate that the adverb was intended to modify everything that came after it, instead of only the clause ending before "or." That is, section 207(c) could have been written so as to penalize any covered former employee

> who within one year after such employment has ceased, knowingly—
>> acts as agent or attorney for, or, with the intent to influence, makes any oral or written communication on behalf of anyone other than the United States, to—[his former agency concerning a particular matter pending before or of direct and substantial interest to that agency].

If the statute were written in this way, the punctuation would make clear that the natural parallelism was to be ignored, and that "knowingly" was to modify both offenses. As it is written, however, the reverse is true.

The appellant's suggestion that there are *numerous* plausible interpretations of the statute reflects nothing more than a failed attempt at cute advocacy; the simple truth is that the appellant's arguments regarding the meaning of section 207(c) make no sense whatsoever on the facts of this case. Indeed, Nofziger is unable to offer any positive explanation for why his reading of the statute—applying the "knowingly" requirement to the communications offense— *is* plausible grammatically. Nofziger

seems to believe that the mere assertion of ambiguity is sufficient, without support, to call into question an otherwise clear statute. *See, e.g.,* Reply Brief at 5. Such a suggestion is nonsense.

Because the statute naturally reads to rule out applying "knowingly" to anything but the appearance offense, the appellant must offer concrete, plausible reasons for his charge of ambiguity. Under Nofziger's approach, parties could always conjure up ambiguity through grammatical contortion. It is difficult to imagine how any statute, criminal or otherwise, could ever withstand judicial scrutiny if courts were to disregard clear mandates of language and to belabor alternative "hidden" meanings.

Thus, in cases in which the rule of lenity has been properly invoked, the lack of clarity in the statute has been striking—unlike in section 207(c). For example, in *Liparota,* on which the majority relies, the statute at issue, 7 U.S.C. § 2024(b)(1), read, "whoever knowingly uses, transfers, acquires, alters, or possesses [food stamps] in any manner not authorized" was subject to fine and imprisonment. In *Liparota,* there was no additional modifying requirement (such as the "with intent to influence" requirement of section 207(c)) attached to any other of the enumerated violations to indicate different *mens rea* requirements for different violations. Because of this, the Court struggled at length with the exact mental state required, ultimately deciding to apply the rule of lenity because

> Congress has not explicitly spelled out the mental state required. Although Congress certainly intended by use of the word "knowingly" to require *some* mental state with respect to *some* element of the crime defined in § 2024(b)(1), the interpretations proffered by both parties accord with congressional intent to this extent. Beyond this, the words themselves provide little guidance. *Either interpretation would accord with ordinary usage.*

471 U.S. at 424, 105 S.Ct. at 2087 (last emphasis added).

It is only after this express finding in *Liparota* that both interpretations comported with "ordinary" usage that the Court could find ambiguity, and thus invoke the rule of lenity. The majority can make no such finding for section 207(c). Indeed, the clarity of section 207(c) is highlighted by contrast to an example of an ambiguous statute cited in *Liparota:*

> What, for instance, does "knowingly" modify in a sentence from a "blue sky" law criminal statute punishing one who "knowingly sells a security without a permit" from the securities commissioner? To be guilty must the seller of a security without a permit know only that what he is doing constitutes a sale, or must he also know that the thing he sells is a security, or must he also know that he has no permit to sell the security he sells? As a matter of grammar the statute is ambiguous; it is not at all clear how far down the sentence the work "knowingly" is intended to travel—whether it modifies "sells," or "sells a security," or "sells a security without a permit." W. LaFave & A. Scott, Criminal Law § 27 (1972).

471 U.S. at 424 n. 7, 105 S.Ct. at 2087–88 n. 7. Section 207(c) simply does not present such a situation. The similarity between the two statutes ends with the "knowingly" adverbial modifier, because the grammar, punctuation and construction of section 207(c) are fundamentally different. As with the statute in *Liparota,* the hypothetical blue sky law includes no additional adverbial qualifier *besides* knowingly. In order for there to be *any mens rea* requirement for "sells" or "sells a security" or "sells a security without a permit," *"knowingly" must be* that qualifier. The point of ambiguity in the hypothetical turns on whether Congress intended *any* modifier at all to attach—*not,* as in the case before us, whether *one* modifier applied to *both* offenses while *another* modifier applied to only one.

In order to avoid judicial legislating—or, worse, the potential judicial mayhem that would accompany reading ambiguity into every statute—the Supreme Court has consistently deferred to the "natural" reading compelled by a statute's punctuation. In *United States v. Yermian,* 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), for exam-

ple, the Court held that the "knowingly and willfully" requirement of a statute [2] did not modify its jurisdictional requirement, because *"[a]ny natural reading* of § 1001 ... establishes that the terms 'knowingly and willfully' modify only the making of 'false, fictitious or fraudulent statements,' and not the ... jurisdiction of a federal agency." *Id.* at 69, 104 S.Ct. at 2939–40 (emphasis added). Moreover, in a footnote addressing section 1001's predecessor, the Court again stated that the original statute's "most natural reading" buttressed the Court's decision. *Id.* at 69 n. 6, 104 S.Ct. at 2940 n. 6. The Court also explained that the jurisdictional element of the *Yermian* statute appeared "in a phrase separate from the prohibited conduct modified by the terms 'knowingly and willfully,'" *id.* at 69, 104 S.Ct. at 2939, much like the "knowingly" requirement of section 207(c) appears here "in a phrase separate from" the communication offense.

In short, when statutes facially admit of no ambiguity, courts have construed them "naturally" without extensive elaboration. For example, the way that the Court in *Yermian* justified its reading of the disputed statute is illustrative: the Court simply delineated the relevant grammar and punctuation without explanation. Thus, Nofziger's attack of the District Court's attempt to give the words of the statute their "ordinary meaning," because of the court's failure to explain "ordinary," Brief for Appellant at 15, is patently disingenuous. When the language of a statute impels a particular reading, courts have not felt the need to explain obvious meanings. Although I have gone into detail with respect to the meaning of section 207(c), it has been to address the *majority's* perceived ambiguity, not my own.

## II.

If there were the slightest doubt about the statute's plain meaning, it would be resolved by a review of the legislative history. As I have already shown, the House version of section 207(c) clearly provided that "knowingly" was the *mens rea* re-

quirement *only* for the "appearance offense." It is undisputed that the Conference Committee adopted the House version of section 207(c), and that this was the version that was enacted into law.

It is also true, as the majority notes, that the Conference Committee adopted the House version of section 207(c) in part to make clear that the subject matter of communication must be of "direct and substantial interest" to the contacted agency in order to fall within the compass of the statute. H.R.REP. NO. 1756, 95th Cong., 2d Sess. 75 (1978), U.S.Code Cong. & Admin.News 1978, p. 4390. But this fact has no bearing whatsoever on the issue at hand. The Committee could have adopted both the House addition on "direct and substantial interest" *and* the Senate language on "knowingly." It chose not to do so and we cannot rewrite the language that was enacted. The simple fact is that the language of section 207(c) clearly indicates that "knowingly" is the *mens rea* requirement only for the "appearance offense," while "with the intent to influence" is the *mens rea* requirement for the "communication offense."

Given this clear congressional mandate, the majority's prominent references to the Carter "Administration draft" of section 207(c) are quite surprising. *See, e.g.,* Majority Opinion ("Maj. Op.") at 443, 448–449. The legislative proposal that President Carter sent to Congress is not the one that was enacted into law. Indeed, the Carter proposal mirrored the Senate version of section 207(c), and this is the version that was expressly rejected in conference. Since President Carter's proposal was rejected by Congress, I cannot fathom what point the majority seeks to make in its invocation.

## III.

Finally, I am constrained to comment on the majority's characterization of the question here as one of whether "Congress has manifested an unambiguous intent to im-

---

**2.** The relevant language of 18 U.S.C. § 1001 provided,

> Whoever, in any matter within the jurisdiction of any department or agency of the Unit-

ed States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations, ... shall be fined....

pose strict liability for the communication offense by limiting the reach of 'knowingly' to the appearance offense." Maj.Op. at 446. This statement evidences a fundamental misunderstanding of the implications of a finding that the statute is facially clear. To say that "knowingly" applies only to the appearance offense does *not* superimpose a strict liability requirement onto the communication offense.

The overarching purpose of the enactment of section 207(c) was to combat the "revolving-door" syndrome, in which senior government officials become lobbyists who seek to influence their former colleagues and agencies on the strength of personal political clout rather than on the merits of the issue before the agency. Therefore, Congress saw a need to attach a "knowingly" *mens rea* requirement to the appearance offense: it sought to avoid creating culpability under an *implied* agency relationship for this offense. This concern is not relevant for the communication offense, which incorporates its own *mens rea* requirement—that of "with intent to influence."[3] By enacting the statute thus, Congress avoided imposing strict liability in a criminal context while simultaneously fashioning a more appropriate intent standard for the unique nature of the communication offense.

## CONCLUSION

Simply put, there is only one way to read section 207(c). The majority's attempt to suggest otherwise, as I have elaborated, amounts to little more than "judicial nullification" of a clear congressional enactment. If section 207(c) is ambiguous, I cannot imagine what language courts would read as facially clear. The point made in the *Hansen* case by our former colleague, now Justice Scalia, is perfectly apt here: Franklyn Nofziger "has not ... been surprised by a novel or unexpected interpretation of

the law." 772 F.2d at 949 (citing *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir.1985)). Accordingly, I cannot comprehend my colleagues' convoluted attempts to embrace the appellant's fancied ambiguity, and their concomitant willingness to ignore clear legislative history and engage in overt legislating. Thus, I respectfully dissent.[4]

EDWARDS, *Circuit Judge*, with whom WALD, *Chief Judge*, MIKVA, and GINSBURG, RUTH B., *Circuit Judges*, concur, concurring in the denial of the suggestion for rehearing *en banc*:

I think that the majority opinion in this case is clearly wrong; however, this is not a basis for *en banc* consideration by the court. Therefore, I concur in the denial of the suggestion for rehearing *en banc*. Any further consideration of this case must be pursuant to review by the Supreme Court.

3. Of course, "intending to influence" and *"knowingly* intending to influence" are different standards, and the former is probably easier to prove in court. Thus, to the extent that the trial court suggested that these two phrases, in practice, represented the same standard, it was in error. However, the fact remains that the trial court correctly applied the "intent to influence" standard—a standard which, despite Nofziger's

claims, creates a sufficient *mens rea* requirement so as not to offend our notions of justice.

4. I find no merit in appellant's or amicus' seemingly half-hearted claims that there is insufficient evidence in the record to support a conviction, or that the Ethics in Government Act may be constitutionally infirm. In my view, these claims border on frivolous.